and Curl O'Brien. Our commission had to exceed 15 minutes to decide. Ms. Olszewski, for the apology. Good morning, Your Honors. I'd like to reserve two minutes for rebuttal, if I may. My name is Jessica Olszewski. I am here on behalf of Philip and Kathy Miller, the appellants in this matter. Philip and Kathy Miller were arrested in the spring of 2011. They were subsequently tried on that accusation and acquitted in 2012. Arising out of that accusation and acquittal come the Millers' claims for malicious prosecution, false light, invasion of privacy, emotional distress, and there's also a claim for supervisory liability at First, I'd be interested in your response to the feature that here, yes, there was the detective's act, but a grand jury issued an indictment. Correct, Your Honor. And there's a presumption that accompanies that aspect. Correct, Your Honor. And it's well established that there is an exception to that rule. That indictment by the grand jury would have no preclusive effect as to the issue of probable cause, where it can be shown that the investigators in the case knowingly gave the prosecutors false information to support and aid the taking the case to the grand jury. And I think that the trial court got the case law right. We're relying on Pete v. City of Detroit and Hinchman v. Moore for the proposition that there's no preclusive effect, that that indictment has no preclusive effect if the investigators lied to the prosecutors to encourage them to seek the indictment. Where we disagree with the trial court is the trial court's finding, of course, that the plaintiffs failed to show the court evidence of those lies and misrepresentations. In this case, we believe there was a mountain of evidence to suggest that the investigator, there was only one investigator, Detective Olem, lied to the prosecutor who was responsible for taking the case to the grand jury. The key issue in this case, and this is really not in dispute, was the competency of the alleged victim, Betty Robbins. The statements in the investigator's reports are that Betty Robbins was a helpless Alzheimer's patient and that my clients, Phillip and Kathy Miller, her daughter and son-in-law, preyed on her. Now, that allegation makes a lot of sense if in fact, you know, it's easy to steal from the elderly if the elderly are incompetent and they have Alzheimer's. The problem is that that statement that Investigator Olem presented to the grand jury... No, he presented it to the grand jury, did he? I'm sorry, Your Honor. He presented it to the grand jury prosecutor in his meetings with the grand jury prosecutor and in his investigative reports. He presented that issue as fact. In his reports, he says Betty Robbins is an Alzheimer's patient. You're going to say, well, the investigator told a lie and so he's liable here for damages. Well, you're saying what if the investigator... isn't the investigator entitled to rely on the statement of another witness? Sure, there's lots of people that lie to investigators all the time. Correct, Your Honor, and I would information that I got from the estranged son who hasn't seen the victim in 10 years. What the investigator said in his reports and in his meetings is it is a known fact that this woman has Alzheimer's disease and that Phil and Kathy took over her caregiving in 2004. Didn't she have dementia and Alzheimer's? I know there are different degrees, but that's not a lie that she was an Alzheimer's patient, is it? The evidence shows that she didn't have any signs of dementia until the end of 2008 and she wasn't diagnosed until 2009, I believe on the timeline. The problem is that the investigator told the prosecuting attorney that back in 2004, she was a helpless Alzheimer's patient. He had absolutely no... And that's the information he got from the son, right? And that's the information from Larry Robbins, who is the son. And the problem is he presented it to the prosecutor as fact. It's a fact that she had dementia and Alzheimer's and the prosecuting attorney did nothing thereafter to corroborate that statement made by the investigator. In his deposition, after the fact, he said... One's a prosecutor and one's an investigator. Correct. Right? Correct. So do prosecutors investigate typically? Right. I'm not suggesting, Your Honor, that there's any claim here against the prosecutors. Those are... Duty to investigate? I mean, where's the fault lie? It's all with the investigator who didn't give... Or he... What would you say it? He tilted the story? He lied. That's what we're saying. And we think the evidence shows that he lied. Because he told the story from the son but didn't give the aspect that the son was a Alzheimer's patient. We assume that he got it from Larry Robbins because that's where he got all his information. He didn't talk to a single witness except Larry Robbins. So we're assuming that it came from Larry Robbins. So first of all, our contention is if he didn't get it from Larry Robbins, he made it up out of thin air because it wasn't true. And secondly, if he did get it from Larry Robbins, he should have told the established fact. If he got it from the son, even if it's incorrect, if he got it from the son, how can that be a knowingly intentional false statement or a lie if you would characterize it? I mean, it just seems to me that that's a pretty broad interpretation of the investigator. Well, the investigator told the prosecutor, it's a fact. It's a fact she was incompetent when these people were stealing from her. And that's his testimony? And that... Who testifies to that? That he said this is a fact? It's in his report as a fact. In his reports and in his conversations. He doesn't give any context to the prosecutor who said later, gee, I wish I would have known that the investigator hadn't talked to the doctor, hadn't talked to the preacher, hadn't talked to the lawyer who'd been working with Mrs. Robbins for 20 years. Gee, I wish I would have known that there was nothing to corroborate that statement. This is all hindsight. And of course, there aren't any claims against the prosecutor. But gee, I wish that that investigator had dug a little deeper. But the problem is that wasn't the only misstatement in the detective's reports. Would you recover on this if you only showed that it was negligent on the part of the investigator, that he should have questioned some other people? Or are you required to have some intentional act on the part of the investigator to blame your clients? I think that the federal law is pretty clear that there's got to be some intentional or knowing... It's not just negligence. Right. Knowing falsehood. That we're not here today to argue that he did a sloppy investigation. Certainly, we do feel that he did a sloppy investigation. But there were four or five critical key areas where he simply lied to the prosecutor. One of the other important ones is that he told Prosecutor Sleeper, who was the grand jury prosecutor, that Phil and Kathy Miller refused to speak to investigators. He said, Kathy Miller refused to be interviewed. Kathy Miller refused to speak to me. This one is really a lot more clear cut than the other. They refused to talk to him without their lawyer. I mean, they were willing to sit down and talk with him with their lawyer, correct? They were. Correct. Well, that was Philip Miller. Now, Kathy Miller was on the phone with Detective Ollam and she said, can I help you? Can you tell me what this is about? And she herself was under investigation at that time. In two places in his investigative reports, Detective Ollam says, Kathy Miller refused to speak to me. And we don't know where that's coming from because that is unequivocally false. When I deposed Prosecutor Sleeper, he said, gee, I wish I had known that Phil and Kathy Miller wanted to talk to me, with or without their lawyer, because I certainly would have liked to talk to them. Prosecutor Sleeper never got the opportunity to talk to Phil and Kathy Miller because Detective Ollam told him that the Millers didn't want to talk to him. So, the question of the communication between the investigator and the accused, very critical, very relevant, because of course, when we hear of people refusing to speak to investigators, we think, well, you know, those people must be guilty. They don't want to talk to the police, even though it's their constitutional right to go out and get a lawyer. So, we view that issue as very critical in the investigation as well. There were a number of other knowing falsehoods in the reports relating to the Millers allegedly giving away their mother's car, relating to the Millers allegedly somehow fraudulently dealing with the sale of Betty Robbins' home. There's sure a whole lot of money that disappeared from her account, right? So, you're saying that your clients had her permission, they just wrote out checks to themselves? Are you talking about with regard to the sale of the home or with regard to the bank records? A lot of it. All of it. Okay. Fair enough, Your Honor. And the time period during which the Millers are alleged to have stolen from Betty Robbins, Betty Robinson was a fully functional 79-year-old woman who was in charge of all of her financial affairs. She was just giving that money away to them to take care of her or something like that? Well, she was spending some of the money herself. It came out in the trial, which is not really relevant here, that 99% of the transactions that were quote-unquote suspicious were actually Mrs. Robbins using her own credit cards and her own funds under her own free will. So, the investigator in this case took these bank records in a complete and total vacuum and made up a story to go with them about how Betty Robbins was elderly and incompetent and in Alzheimer's and then told that story to the prosecutor. And, in addition, told them that, hey, these people don't want to talk to you. And, by the way, they gave away their mother's car. When Detective Olam made the statement to the prosecutor that Mr. and Mrs. Miller gave away Betty Robbins' car, the information he had in his possession at that time was that the car was given to her sister-in-law, I believe. Betty Robbins signed the transfer herself. The Millers didn't have anything to do with it, and it was four years before Mrs. Robbins was diagnosed with Alzheimer's. Before your time expires, Ms. Olashke. You got it. I wonder if you'd respond to the supplemental authority that was offered that suggests that without the benefit of the grand jury transcript, the court's very hampered, and apparently we don't have it. We don't have the grand jury transcript, Your Honor, and that's a non-issue because the case law is very clear. The tort of malicious prosecution encompasses everything from the investigation all the way up through the indictment. So, whatever happened at the grand jury— You want to proceed without that. Correct. I think that's unimportant. It's irrelevant because the focus here is on what happened to prompt the indictment in the first place, and we're focusing solely on the investigation. You don't know who testified before the grand jury or what they considered? Well, I do know, Your Honor, because Prosecutor Sleeper slipped— We don't know. Right, right, right, right. It's not in the record. It's not in the record. We believe Detective Olin testified before the grand jury, and he's the only— We don't have proof of that. We don't have that. Did he say that— The only mention of the— Prosecutor Sleeper mentioned in his deposition, which is filed with the court in the summary judgment pleadings, that the only witness he called was the detective. All right. Thank you. Thank you, Your Honors. I appreciate your time. Mr. Yasowitz. May it please the Court, my name is Andrew Yasowitz. I represent Detective Kevin Ullum and prosecuting attorney Carol O'Brien. There are three reasons that plaintiffs' malicious prosecution claims against Detective Ullum fail. The first is there was probable cause to indict the plaintiffs. The second is Detective Ullum didn't participate in the decision to indict the plaintiffs. And the third is that none of the false report allegations made by the plaintiff are true, and even if they were, they wouldn't obviate probable cause. In opposing counsel's argument, I believe, Judge Cook, that you stated that with an indictment there's a presumption of probable cause. That's actually not quite accurate. In this circuit, an indictment is conclusive proof of probable cause. And the only exception to that conclusive proof of probable cause is if the defendant knowingly presents false testimony to the grand jury. And that requires the plaintiff, or plaintiffs in this case, to show what actually occurred at the grand jury. Recently, we filed a supplemental authority, Snow v. Nelson, where this court, a different panel, specifically stated that without the testimony of the grand jury in the record, we can't discern who testified, much less presume that someone testified falsely. And, Judge Seidler, that case was based on your opinion in Young v. Owens, where you wrote in dismissing a malicious prosecution claim where there were allegations of false testimony, but there was no record of false testimony in the grand jury, and you dismissed or affirmed the dismissal of the case. Counsel, Appellant's counsel argues that we should not just look at it at the grand jury level. She, in fact, argues that what happened in there is really irrelevant because it's all of the misstatements that occurred in the investigation, which was a predicate, really, to the grand jury proceeding that we ought to be looking at. And that's what taints this process and gives her a cause of action. I'd like you to respond to that pre-indictment series of activities. Thank you, Honor. I would point you to the case of Carver v. Mack, 112 Federal Appendix 432, in which that exact argument was rejected by another panel of this court. Evidence that the defendant provided inaccurate information to the prosecutor is not evidence of dishonesty at grand jury. And this court has been very consistent in these types of cases that you have to show what actually occurred at the grand jury. Bacos v. City of Olmstead Falls, another case that we cite, no evidence of irregularity in the actual grand jury proceedings. And, Judge, to your point about presumption, even in circuits where it's not conclusive proof, but, for example, the Second Circuit, where it is just a presumption which could be rebutted, we cite a case, Rothstein v. Carrere, which also states the plaintiff has the burden to specifically show what occurred in the grand jury in order to rebut that presumption. So even if it were a lower level, you would still have to show what happened. In answer to Judge Donald's question, everything funnels back into the conclusive presumption, and we need the grand jury. And all the pre-counsel has been talking about, and Judge Donald's asking about all the prelude to the grand jury, does that matter or not? I don't believe so. It would matter. So where it matters, and I'm going to get to this point in my second part, so Detective Olm didn't participate in the decision to prosecute. Now, where there's case law about the- The counsel, of course, makes the legitimate point that he fed the prosecutor. Sure. And so where there's case law about any inaccuracy or dishonesty in the report would relate to that element of malicious prosecution. Detective Olm clearly did not make the decision to prosecute. The grand jury prosecutor, Mark Sleeper, testified that he independently reviewed the reports, that he did his own legal research, and that he made the decision to prosecute. Did he do investigation? He didn't do any of- He makes the point that had someone decided to talk to the doctor, the lawyer, not the Indian chief, but okay, somebody would have talked to some of these people. They would have had a different take. Sure. And so that question goes to, well, is there a claim that if the detective did a better investigation that it constitutes malicious prosecution? And the answer to that is no. We don't have that claim in this circuit. I don't think this court has to go any farther than the grand jury indictment. They don't have proof of a knowing false statement at grand jury. That's the end of the malicious prosecution claim. If you wanted to go further or if you decide to go further, there was probable cause for this indictment in any case. This case started when Betty Robbins told her son, Lester, that Kathy took all my money and dumped me here, meaning a nursing facility. That's what she told her son. That's when her son and the other- This testimony from the son. Yes. It's a report from the son. It comes from the son. And that's when they started looking into the finances and contacted the Delaware County Sheriff's Office. How long was that before the decedent was found to be incompetent? Or if she's decedent, I'm not sure whether she's dead or not. Well, I don't know that- The mother. I don't know when she was found to be incompetent. Did you claim she was incompetent before she was found to be incompetent? The detective did not claim that. And I'll address that point in a moment. But when you look at the records, Betty Robinson's husband died on June 9, 2004. At the time of death, Betty Robbins had a checking account, had $13,000 in it. By January 6 of 2005, that account was down to $33. And a lot of that money went to Philip and Kathy Miller. The plaintiff's claim is just used for her benefit. She was signing the checks and all this stuff. That's not true? That is what they claim. And that's their defense, that all of the transactions here were authorized. And by the time that this case went to trial, Betty Robbins was incompetent and she couldn't testify. So all they had were the records, and Judge McGrath couldn't find, just based on the records, that he could get beyond a reasonable doubt. Although he did say that the state was fully justified in bringing the case, and the case also got by a Rule 29 motion for a judgment of acquittal, which, while not conclusive proof of probable cause in and of itself, is certainly a supportive factor in determining whether there was probable cause. But when you look at all of the withdrawals and the corresponding deposits into the Miller's account, and this included ATM withdrawals from Columbus, Mansfield, and Hilliard, which are 20 to 40 miles away from where Betty Robbins lived. It included payments for the Miller's car insurance. It included airline tickets, gas payments, when the only car that Betty owned was a car that, according to the plaintiffs, didn't work. And when you look at what happened, for five years, all of Betty's assets and money are slowly funneled away from her. Money is taken out of her checking account. In January of 2005, her home is sold. The report from her son is that Kathy Miller told her that she needed to sell the home because she didn't have any money, so she sold it. She made money on that transaction, about $25,000, and in less than four months, that $25,000 was all transferred out of her account. So there was never any guardian or conservatorship established and never any court oversight with respect to Betty's finances and her care? There was not. Okay. And that money was transferred to the Miller's. In May 2005, her car was given as a gift to Phil Miller's sister. In 2008, her life insurance policy was transferred to Kathy Miller. It wasn't very big, though, was it? What's that? No, it wasn't very big. Kathy Miller took out a $1,200 loan against it in 2009 and then surrendered the policy in 2010, a total of about $2,400. But I guess, Judge Seiler, I do want to say if the plaintiff's attorney stated, well, 99% of these transactions were her own free will. Well, even if you believe that and 1% wasn't, then there's still probable cause for theft. So even if you take out some transactions or lower the amount, then there's still probable cause that a crime has been committed. During all these times and all these transactions, was Betty signing the checks or somebody signing for her or do you know? I don't know. I don't have a handwriting analysis. But I think the point is a reasonable detective could look at these transactions and getting information from other family members who tell him, our mom doesn't spend like this. This isn't like our mom. And he could believe that there's probable cause that a theft has been committed. He then turned that investigation over, and we did cite a case, by the way, State v. Estrite, which is an Ohio Court of Appeals case. That's a very similar situation. And to the point about competency, theft does not require that the victim be incompetent. You can be competent and still have money taken from you. And in State v. Estrite, which is a very similar situation, the mother who had money taken from her by her daughter was competent. I did want to briefly address Detective Olin did not make the decision to prosecute. That's another reason that he can't be liable for malicious prosecution. He's got to participate in a way that aids the decision. He turned over his investigation to the prosecutor. The prosecutor reviewed it, and the prosecutor made the decision to indict. And he testified that it was his decision and that he didn't get any influence from the detective. Who made this decision, Sleeper? Sleeper. He's not been sued here. He was not sued. They did sue the prosecuting attorney of Delaware County, Carol O'Brien, who had nothing to do with the decision to prosecute this case. What the allegation is against Carol O'Brien is that there were some conversations about whether the case was questionable or not. Actually, she testified to the exact opposite on Record Entry 60, Page ID 12-13-16, that there were no discussions about whether this was a questionable case. It wasn't a questionable case in their minds. But even if it were and she had these discussions, the decision to indict and discussions about the decision to indict are entitled to absolute immunity for a prosecutor. As Judge Frost noted, it's difficult to conceive how Ms. O'Brien's minimal involvement in this case could lead to a constitutional violation. As a supervisor, you have to show that she actually herself engaged in unconstitutional conduct. I want to go back to Detective Ullman because she said that he did not aid in the decision to prosecute. But the prosecution was based on the investigative report that was prepared by Detective Ullman and presented to Prosecutor Sleeper. So because that was the basis, how can you say that he didn't aid in the decision-making because they relied on his report? So Judge Donald, that's where if he misled the prosecutor, then he can be deemed to have influenced the decision to prosecute, even if he didn't make the decision himself. It still wouldn't obviate probable cause and the plaintiff's burden to produce a grand jury transcript, but that's where that case law comes in. I just wanted to read. This is what he said about he never called her... Ullman? Ullman. This is what Ullman wrote. He never called her a helpless Alzheimer's patient. He never uses the word incompetent. In his summary, he writes, and this was written in 2010, Betty Robbins is an adult female who has been diagnosed with dementia and probable Alzheimer's. Betty is unable to provide care for herself. That was all true. It's in the complaint. That was all true at the time. He never used those words, incompetent. They're just making that up. I see that my time is up. We would ask you to affirm the decision of the district court. Thank you. Thank you. Thank you, Your Honors. I want to clarify that comment about 99% under her own free will. The other 1% that I was referring to was the fact that Betty Robbins had given her daughter a power of attorney, and on two occasions she told her daughter to go use that power of attorney, and that accounts for the other 1% of the transactions that were all given under or made under Betty Robbins' own authority. The second point I want to make, Your Honors, on rebuttal is that we should not be talking at all about the grand jury transcript because the trial court got that part right. The trial court spent its entire analysis talking about the pre-indictment conduct of the investigator. The trial court didn't see it from our perspective and didn't think that the lies amounted to much and didn't think that they had a negative impact on the decision to indict, but the trial court found, and I think they were relying, and I think Judge Frost was relying on Hinchman v. Moore, a decision from this court, that states that the pre-indictment conduct of the investigator is very, very important in the determination of whether or not the indictment was made with probable cause. You don't have a cause of action unless the matter goes to the grand jury here, do you? Don't have a cause of action for malicious prosecution? Yeah, in this case, because it's based upon the indictment, and if there was no indictment, then there's no case, right? And in Hinchman, the court says, we've got to look at what dominoes led up to that indictment, what prompted the indictment in the first place, and if it was the lies of the investigator to the prosecutor, then that is the inquiry for the court here. But you have to trace it through the grand jury. He may have come in there and told the grand jury that he made a report, and it's all erroneous, and let me tell you what the true story is. And, Your Honor, the question for a jury in this case, which we unfortunately never got this to a jury, is would the Millers have been indicted anyway? The defendants want to stand up and say, yeah, we had all kinds of proof that they would have been indicted anyway. That's not for them to say. That's for a jury of the Millers' peers to say, and that is what the trial court got wrong, taking that decision away from a jury of the Millers' peers. I want to note very quickly, because I see I'm out of time, that I filed some additional authority this morning, a case out of the 10th District. This would relate to the immunity on the state law claims. It's Holley v. Herron, and I just filed that this morning. We'll look at it. Your time is up. All right. If it's there, we'll see it. Thank you. Thank you, Your Honors. Thank you. You'll receive an opinion in due course. Thank you.